Good morning. I'm the D.M.S.I. Court Counsel. My name is Mark Larson. I represent the defendants and the appellants in these three matters. The first matter, the D.M.S.I. matter, presents primarily a question of standing. In fact, that's a common issue throughout the three cases that are being argued today. Specifically, whether or not Branch Banking and Trust Company had the right to enforce loan documents at issue when it filed these lawsuits in 2011. Now, the history of this case goes back to 2003-2004 when the defendants initiated a banking relationship with Colonial Bank. Now, defendants are recent state developers. At one point in time, there were over a dozen loans made by Colonial Bank to this group of defendants that were due with combined principal balance as well as $20 million. Most of these loans were secured by real estate, primarily raw land, either in Nevada or Arizona. Some were used as construction loans. Others were secured by operating businesses. The loan at issue in the D.M.S.I. case was unique in that it was unsecured. So it was an unsecured line of credit. Now, as Southern Nevada and Arizona entered the recession in 2008-2009, most of these loans had come due and been extended or renegotiated. The defendants at Colonial Bank were working to salvage what they could from these loans and assets as a service collateral. In 2009, however, under the pressure of King George III for Colonial Bank, the FDIC stepped in and took over. And in August of 2009, an asset purchase, a purchase, a subsidy agreement was executed between the FDIC and Branch Venture Trust Company reporting the transfer of certain Colonial Bank assets to BB&T. There wasn't a loan sharing agreement that was incorporated into that agreement to mention the three loans at issue. There was a loan sharing agreement that was included within the purchase and subsidy agreement, that's correct. It doesn't make it standing, do you? It did not specifically reference a huge loan at issue in this case when it was executed. Subsequent to the execution of that agreement, I believe it was two years later, there was a schedule to prepare, Schedule 4.15B, which was released in the briefings. It was heavily redacted. They did identify certain loans were subject to loan sharing provisions. Basically, all three of the loans at issue? Correct, yes. Why isn't that sufficient for standing approvals? Had that been executed, or excuse me, had that been prepared and attached to the purchase and subsidy agreement at the time it was executed? Potentially, yes. Why is it saying it wasn't? Because there was no evidence in the record indicating that that schedule, Schedule 4.15B, even existed when the agreement was signed. They come back two years after the fact and prepare a schedule after the lawsuit had been filed and argued that it was difficult to stand and it isn't sufficient. There has to be some evidence in the record that there was a transaction that took place instead of negotiating these instruments from the FDIC to BB&T. And in this case, in all three of these cases, the record is devoid of any evidence of such a transaction. In fact, I'm speaking specifically with regards to the purchase and subsidy agreement. The Nevada State Court has already looked at this precise issue. It referred to Occupy RNFC, Rosalinda's case, which we cite in her briefs. Specific issue? It wasn't the same loan that was issued there, and it wasn't a question of the bank standing in that case, was it? Correct, it was not the same loan. It was an evidentiary issue. The schedules had not been presented to them. Not quite, Your Honor. It was an evidentiary issue. We have the purchase and subsidy agreement. We also have, in October of 2009, a separate bulk assignment that was executed, and then specific assignments as well. In the Murdoch-Tarrant and St. Rosalinda's cases, the purchase and subsidy agreement had been produced that was in evidence. It was that subsequent bulk assignment and a specific assignment that had not been produced that were excluded as sanctions. So the court was looking squarely at the issue of whether or not the purchase and subsidy agreement standing alone was sufficient to demonstrate that AP&T had a right to enforce a loan required for employing a bank through the FDIC. And on that specific issue, looking at the purchase and subsidy agreement standing alone, the Nevada District Court and subsequently the Nevada Supreme Court both determined that the purchase and subsidy agreement was insufficient to establish that right to enforce those documents. AP&T was a party to that case. It was a case that was due to get on its merits. Obviously, the key was final judgment. It was affirmed by the Nevada Supreme Court. So what issue in your mind was decided in that case that there was thought from challenging them? What's the specific issue? The specific issue is whether or not the purchase and subsidy agreement standing alone establishes the right to enforce the loan documents that AP&T acquired through FDIC. On that specific point, the Nevada Supreme Court said no, it doesn't. Granted that the court, the District Court and the Supreme Court in that case, or those cases, was not looking at the bulk assignment agreement or the subsequent specific assignment agreement. They've been excluded on all evidentiary grounds. What they're using that specifically was? Ties to the locker, rather. Exactly, yes. Which is not the issue that we have here. Well, I don't know that there's a meaningful distinction there, because the issue there is does AP&T have standing, by establishing that they have a right to enforce the documents issued and be appointed to certain agreements to establish that right, one of which is the purchase and subsidy agreement. And it's already been determined by the District Court and the Nevada Supreme Court that a purchase and subsidy agreement standing alone is insufficient to establish that right. But they didn't have before it the loan sharing agreement or the subsidy agreement. Well, the loan sharing agreement is the issue. The law sharing agreement is one of the sections. The purchase and law sharing agreement. It's more than the same with the purchase and subsidy agreement. It's the same document. There are numerous sketches that are referenced in that document. However, as we do the haphazard nature of the FDIC, stepping in and taking over and making those sketches that are referenced in the document that show they've described what assets were being transferred were never actually prepared or attached to the document. With regard to Schedule 3.1 and 3.1a, where those assets should have been identified, to this day I don't think they exist. Schedule 4.1.5b, which the Court already referenced, that did come into existence later on. But that was two years later. I believe it was after the lawsuit had been filed. It's insufficient to actually establish standing on that right alone. Once we get past the purchase and subsidy agreement, we come to the bulk assignment, which was executed on October 23, 2009. That bulk assignment recorded the transfer to BB&T. All of the security interests, excuse me, security instruments, these interests are related to the indebtedness of the FDIC they've taken from Colonial Bank. Now that bulk assignment did not identify any particular loan with any level of particularity whatsoever. So on that point alone, we would say the bulk assignment is invalid. Like most other states, it requires assignments of that nature to be in writing and to describe some minimal degree of security interest. I mean, if you look at the documents that they're referring to, if you look at the deed of trust, for example, doesn't that explain that there's an indebtedness right in the program? The deed of trust certainly would, but the deed of trust was not specifically referenced in the bulk assignment. But we're talking about indebtedness. It's not a single element that's involved here. No, but again, I think in other words, some of the deed of trust recorded documents, reference numbers, for someone to go to to find those documents, I think that probably would have been sufficient. But again, it did not make any attempt to identify those interests with any degree of particularity. It simply said all security interest needs addressed related to indebtedness. And I'm paraphrasing, but that's essentially what it said. If you look at the deed of trust, it describes the property. We don't know what property we're talking about. But you don't know what – it doesn't say what deed of trust to look at. Wow. And in the case of the DMSI loan in particular, it's very important because this is an unsecured loan. So that bulk assignment, which purports to transfer security instruments, deeds of trust related to indebtedness, does not apply to an unsecured loan. And I think that was a major error of the District Court case in this case by not acknowledging the fact that this was an unsecured loan. Can we jump forward a little bit? Suppose we disagree with you and stand on the issue across the board. You have other issues you want to raise. Correct, yes. So the district judge ultimately enters summary judgment on the question of liability, right? Correct, yes. And so the resolved scenario is to reserve the issue of damages. And so it had down into two parts. One, he decided that the fair market value of the properties had to be decided by the district. He would consider it not a jury. In two of the three cases, yes, the DMSI is unique in that it was an unsecured loan. So when he had a summary judgment, he did enter judgment. But he had Regina in the other one. Correct. We're going to go to trial. And she decided the issue of fair market value. And he spoke with Ransch. He said yes to Regina because he had determined that the defendants were not entitled to a jury trial at a point that had been stipulated with PB&T as to fair market value and reserving the issue. So what do you understand were the issues that were reserved for trial in the two cases that were split into trial? What actually ended up being reserved was the fair market value. There were also a number of referendums that the judge later resolved for motion. I mean, he said they basically didn't apply anymore, considering that he had already adjudicated a liability issue, which we believe is incorrect. Now, you take issue with this. Is it your contention that some of those issues that he dealt with in the motion to eliminate, that they actually went to the issue of damages or that they were never adjudicated in the summary judgment ruling? Well, I think we're not. I think we have to skew between these two cases with respect to the MSI. I don't think they're specifically addressed through the ruling on the motion for summary judgment, but it's our motion for reconsideration, which was denied. We brought that point up and the court didn't address it. I mean, what specific reason? The affirmative stances of good faith in Turkey, I think, did not fall specifically with regards to the MSI case, and that was based upon what's been termed a work-out agreement, which was. . . But those are defenses that went to liability, right? They did. I believe they also, in the other cases, it's different. I think they do address liability primarily, yes, but I think the question is the fact that we're not. What about the small grants? Small grants, we have affirmative defenses that include failure to mitigate, how to pay faith in Turkey, maintenance in Istanbul, latches. This is a situation where BP came to the picture in 2009, initially gave this tendency of pressure to everybody to continue working with them, as Colonial Lake had in the past, extending these loans, tend to rely upon those representations, continue to pay taxes on these properties, continue to maintain them. You claim this was a separate agreement. What was the consideration for this separate contract that you allege with regard to the work-out? What was the consideration? The consideration was the defendants continued to pay taxes on the properties, continued. . . Well, you had to do that under the terms of the loan if the property wasn't foreclosed on you, correct? I think they would have had to. Anything that you had to do under the terms of the agreement, that wasn't something that came into being as a result of the work-out agreement, correct? Paying taxes, yes. Maintenance responsibilities, I think, are different. The defendants continued trying to develop several of these properties, continued working with investors, continued working with architects and plans for them. Where do you find a duty to foreclose at any given time in the agreement? Where does that come from? I don't think that's the fourth expression in any of the loan documents. I do not believe that that is expressed as the fourth in any of the loan documents. If you don't have a duty to do something, how do you have a duty to mitigate it? Well, I did, about a while ago, do a part of seeking and reviewing the courts. So if things have been marked as having a duty to mitigate their damages, I think that's a part of what applies personally across the board. So when should they have foreclosed on the property then? Well, you would have had the foreclosed in 2009. I did look at some of the contexts. You have to understand what's happening in the real estate market in Southern Nevada and in Arizona at that point in time. Property values were declining rapidly. As BB&T delayed the foreclosure, the property continued to decline in value. Deficiency, conversely, went up. All the while, BB&T is receiving money from the FJC and has lost her agreement. Do your clients have any ability to direct that the property be sold or to request that the property be sold? They certainly could have put it up for sale in 2009. There was equity in the properties in some of them at least. If not for BB&T's representations, they would continue working with the defendants to find a solution. I couldn't have done that with regard to what they said to you with the properties. They chose not to because BB&T, again, represented to them that they would continue working with them as a colonial mechanic in the past. I hear there is support by case officers who would work the other way, too, right? In other words, the borrower could make the language lag as the market's going up. There's no reason why they shouldn't work both ways in this case. It's a very open-ended job. Where does the policy carry you for it? I don't think it is controversial to the party. It has to be an action you face to fairly consider the property to a contract. I don't know what control, but you have a strong voice in when the foreclosures should take place in education. You don't use them. The lender's got to look at market conditions. But if the lender ultimately controls when the foreclosure takes place, I agree that there are things a borrower can do to delay foreclosure bankruptcy. There are certain things that can happen that didn't happen in this case. Well, my kids from 1980 said, well, they should have delayed for two years before they foreclosed because everybody knew the market was going up. It's the same principle as this. It's similar, but it goes to good faith, I think, and that's the main issue in this. As soon as you go to dead faith, you should be able to make a dead faith argument either way, up-market or down-market. I think that potentially has been this case. I think what was the focus of the defendant's counter in pursuit of affirmative defenses and in countering some of the other cases was that the ABT did not act in good faith. The ABT strung them along, convinced them to spend money maintaining these properties, trying to develop them, when the ABT had no real intention of doing any sort of work in agreement with them. Now, that's an affirmative defense, right? It was. In a sense, I mean, it's based on the underacting in bad faith. Correct. In the DMSI case. This is burden-proofing, right? Correct, yes. I was going to say now, but does that go to, you know, liability or damage at all? That's bad faith, I think, assuming it is bad faith. I think you can touch upon both. Because by delaying the foreclosure, the damages on the cases where there was real property collateral increases the distance these went from personally nothing in 2009 to I think we're now at over $20 million. And you raised that in the trial court. Did you get any reaction from the district judge on that defense? Or did you, you know, just completely flip it on the other end? It varied. In the DMSI case, it was, to this point, we presented evidence in the conviction that there are motions of summary judgment and there are oppositions to the plaintiffs' motions of summary judgment, a declaration on the principles, one of the defendants attesting to the facts underlying this long work-out agreement. In the other two cases, it was... In the SMI case, how were they prejudiced by a work-out agreement? There's no property in that case. The agreement was that if the defendants continue to maintain and develop the other properties, that the DMSI loan would be forgiven when the other properties were sold. That was what, for any source, the witness that was in the declaration in support of the defendants' motion for summary judgment and the oppositions to the plaintiffs' motion for summary judgment attested to. And the school category was reduced to negotiations, right? There was nothing that ever been... It was not reduced to writing. It was reduced to writing. That's right. It was not reduced to that. That's right. These are sort of proposals that they were... I would say it went beyond simply proposals and negotiations. You know, my clients, I don't rely on them. I don't have people looking through representations for me to them that she would work with them going forward. And it was never reduced to writing, but my clients were comfortable with the relationship, and as it occurs at that point, and it wasn't until 2011 when BPT began soliciting the properties. I'm sure you've heard of the other two properties, sir. I have. The two cases that Regina and the other court spoke of. Silveridge's. Silveridge's. And the difference is that the rule as a matter of law that solicitation defends damages was just barred. It was going to raise it as a matter of law. I don't think it did explicitly, no. It didn't grant it. BPT's only for summary judgment. It's just ignoring those issues at that point in time. And when they came up later, before trial, on motion and remedy, so it seems as though they've already kind of addressed this and maybe going further than that. But Joe, I thought he was responding to the work and evidence relating to the work. That's correct, yes. I'm just curious. Did he ever say you can't present? You can't present any evidence regarding mitigation? Before those two cases, he was going to trial, yes. And on the motion and remedy, he did say that. But as I said previously, we presented a commission to motion for summary judgment. I've got a few little lessons to administer. Maybe you'd like to reserve that for your own. Okay. Good morning. My name is Jared Clark. On behalf of Ability and Creatives, a rights-making trust company. If I may, I'd like to start by addressing the constitutionality of the statutory amendment to Amendment 40.459.1c. Prior to the amendment in 2011, that statute consisted of a mathematical formula determining the amount of deficiency to be judged. And that mathematical formula consisted of looking at the indebtedness and seeing how much it exceeded the greater of the fair market value of the property on the data form closure or the amount that was actually paid on the data form closure to the trustee. Amendment changed that formula. And it changed that formula such that one no longer looked at the amount of the indebtedness, but in cases in which the party was not the original lender, but rather acquired the loan documents by assignment. The analysis was to look at the amount of consideration that was paid by the party and to see whether or not it exceeds the greater of the fair market value or the trustee or the amount paid at trustee's end. And this change was dramatic. Prior to the amendment to 40.459.1c, the amount of consideration paid between the parties if there was no lender in any subsequent assignment of the loan documents, it didn't matter. The consideration was a matter of dispute between those two parties, and those two parties only made the consideration in clear cases that a dollar or promised to pay a dollar. Suddenly, in June 2011, the statute was amended so that the amount of consideration paid and the sufficient amount of consideration wasn't just an issue for the two parties to the assignment transaction, but rather it became an issue to be raised by the borrower as well. Is your position that this is preempted, correct? It is our position, Your Honor, that it is both preempted and invalid by virtue of the contract's law. So you're not in your argument that it's preempted if it's known necessity to go to the contract's law? You are absolutely correct. I think preemption is a more thorough analysis because under the Supremacy Clause, the issue is whether or not FIREA conflicts with the state law and it absolutely conflicts with state law. FIREA empowers the FDIC with the ability to take the assets of a failed bank and either liquidate them or transfer them to a healthy bank. And courts have, throughout the nation, felt that it is their important right to be able to transfer the assets of a failed bank to a healthy bank because that allows the public to keep confidence in the banking industry. It saves money for the FDIC. It's generally good for the public. By limiting the amount of any deficiency judgment to a fact that is zero because in most cases, the consideration paid for a deed when viewed retroactively, the consideration paid rarely approaches the fair market value. So your theory is not that it conflicts with a specific provision but with policy behind the federal side? I think both. I think both are because through a specific policy, it is the policy that allows the FDIC to conduct its business. But I think only the low 212 U.S.C. 1821 sub D, sub 2, sub G, which are the statutory provisions that allow the FDIC to transfer the assets of a failed bank. And I think that the amended 40.4531C has little conflict with those provisions because it effectively prevents somebody from buying a decanted transfer. The most you can ever make is the most you pay and no one's ever going to buy those assets for absolutely free. And it absolutely destroys, in the word of one court, destroys the FDIC's ability to do what's done. And for that reason, I agree it doesn't create a distinct law. Now interestingly, this distinct law was really only done in the Nevada votes for four years to legislate a section 203 when it was finally amended to or tailored to the original purpose of 40.4531C, which was to protect individual homeowners. Interestingly, during the four years that the statute existed, it was never applied by individual homeowners. Individual homeowners have never utilized the statute. It was utilized in every instance in cases where the FDIC acquired the assets. In every instance by at large commercial development of either real estate property or commercial property. And for that particular reason, it violates the contracts clause. More importantly, how do you have standing in the homeowners' courts? Did you decide to bring this up? Well, it deals with essentially two arguments regarding, say, the Newton-Warner versus the Verdon case, also known as the Manhattan case or the Syros case. And secondly, it has to do with the question of the viability of the loan assignment. As far as the Verdon case... Yes, and I loaned a transfer under the loan assignment. It... Since I was unsecured. It was not a secured loan. However, the bulk assignment it states that everything was owned by Columbia Bank under the standard of that. It has been transferred to BBT. That's what the bulk assignment says. And it was recorded down. In fact, the DMSI loan is an unsecured loan and therefore there's nothing off record. It certainly eliminates any argument on behalf of a balance that there's something wrong with the bulk assignment because it doesn't concern any real property. But I think it still affects the transfer. The bulk assignment affects the transfer. Purchase and assumption agreement would combine with Schedule 4.15B. By this, that's the Schedule 4.15B. What happened in it was on August 14, 2009, two important transactions took place. One, the FDIC acquired all of the assets of Columbia Bank. And on that very same day, BBT came in and acquired all of the assets of Columbia Bank on the same day. And the amount of due diligence that BBT gets before conducting that transaction is extraordinarily limited. They get a day or two heads up that the transaction can take place and then the FDIC accepts the bid. That Schedule had not developed until after the lawsuit was broken. What was it in place for 4.15B? 4.15B. Because all of the lawsuits were filed in 2011. The GMSI was filed in November 2011. The Smoke Branch was filed in March of 2012. And the Regina Holds one was also filed in March of 2012. It is my understanding that based on the testimony of Brent Hicks, who was the individual at BBT who worked at the FDIC in preparing Schedule 4.15B, that it existed prior to the filing of the complaint. What is the evidentiary basis for that? The testimony of Brent Hicks. Now, who was prepared after the initial transfer? Absolutely, he was prepared after August 14, 2009 because, again, the parties didn't really know what they were getting. And the FDIC prepared Schedule 4.15B as an opportunity to kind of buy all of the loans that were being acquired by BBT and then it sent them to BBT and said, here's what you're getting and here's what the quote, value is of all of those loans. So, it is hard to put a purchase in assumption of very much but it was not prepared on August 14, 2009 because, in fact, August 14, 2009, because that is when the transaction took place and the dollar amount that's listed in Schedule 4.15B as to the quote, value of all the three loans that are the subject matter of this lawsuit is then dictated to the dollar amount as August 14, 2009 besides when the transaction took place. Let me ask you a question just in the sign book. I mean, in this kind of transfer of the assets of a failed bank, is that what happened here? In your clients, the purchaser in that transaction with the FDIC, right? Yes. Does the agreement include some kind of a full armless or warranties or anything like that? Well, it does by virtue of the lost share agreement. And the lost share agreement was basically the last half of the purchase and consumption agreement. In the lost share agreement, the FDIC is saying, here are the assets of this bank and you're taking them. However, if you should suffer any losses in trying to collect all these assets, we, the FDIC, will initially share in 80% of those losses. So it's a way to tell a healthy bank... I guess what I'm getting at is that it was supposed to include that in all these after the fact executed documents in order to preserve any purposes. So, your client is understanding. Did you go back against the FDIC  they invested in the transaction? Well, it's an interesting question. I don't know. But the purchase and consumption agreement does say that the FDIC as the receiver for Colonial Bank is transferring these assets to BB&T and if it turns out that BB&T didn't get those assets, that's certainly true. The FDIC would not be in compliance with the purchase and consumption agreement. But I guess the complete thought on standing, there was the question in the Muragh case, and the Muragh case is just a different case. I will stop on this conclusion. It does not apply. And there does seem to be a question in the Muragh case whether it's a standing case or an evidentiary sanction case because what happened was the only announcement produced in discovery in that case was the purchase and consumption agreement without the schedules and without the testimony of the defendants and without the public assignment. And so Judge Gonzales at the District Court of Oklahoma in Nevada determined that in 8 in BB&T after the close of survey was trying to offer that evidence to show that that specific Montana defense or Judge Gonzales is not going to allow the defendants and therefore you don't have standing. Now Judge Gonzales again at the State of Nevada District Court level was in great pains to say this is not a standing case. This is an evidentiary  But my appeal is to say that the Nevada Supreme Court interprets it as a standing case. Regardless, however, the facts are entirely different. In fact, some courts after the Murdoch case have observed that BB&T is fairly hard. It's less than the evidentiary sort of falls in that case because now when BB&T is attempting to enforce its loans it does include not only the purchase and consumption agreement but also, as in these case cases, Schedule 4.15B the public assignment the specific assignment and indeed the testimony of Mr. Hicks or some other employee at BB&T to testify to all of those documents. Bottom line, though, is that BB&T is standing either as a holder vis-a-vis the alarm or as a non-holder. In the launch you mentioned that it was undated and didn't have to be attached to the document? Yes. It wasn't? Well, sometimes it was and sometimes it wasn't. When the document was received all we needed was a stapler or a paper clip. It happened. Well, in some cases it was attached and in other cases it was produced separately. But I think this matter is pretty far over substance, Your Honor, because there was no question that the borrowers at BB&T had acquired a loan. And the reason I know that is because Ronnie Florez, one of the borrowers, decified in an affidavit that he had been negotiating BB&T representatives since August 2009 about this alleged work-out agreement and that these negotiations continued on through the end of 2010. Well, clearly, if the purpose of the endorsement is to put the borrower on notice of who has the right to enforce the loan delinquency, I would argue that that purpose has been met because the borrower was well aware that BB&T was being holder of the note. But even if they were without a statement or without a paperclip, BB&T is a nonholder due to the loan documents were indeed transferred. There's no question that BB&T possessed the loan documents. There's no question about the purchase of the loan documents as a litigation. Let me first start by observing two inherent conflicts in a bill itself. The first conflict has to do with the conflict between saying that BB&T should use the foreclosure immediately and use property values for decreasing in conflict with their argument that they were in agreement  agreement. The second conflict is should BB&T have foreclosed and ignored these requests one more time or should BB&T have not foreclosed and allowed in more time. That's the first conflict. The second conflict is a factual matter. It does. And they don't really need to get to it. Just quickly, the other conflict is that they seem to understand that there was work in agreement and yet they signed a written acknowledgement acknowledging that there is a conflict. He signed in August of 2002 an acknowledgement on behalf of all three of these loans stating that the understanding been in discussions with BB&T about potential workouts and potential solutions however they further understand that BB&T has not waived any of these rights under the written loan agreement including the right to foreclose. Absolutely. So, if we get into the merits of the workout agreement and the merits of this alleged formal promise we've got a couple promises first. It violates the provisions of the loan agreement. There was no that the loan agreement required any modifications to be in writing so you can't violate any         agreement required   to be in writing so you can't violate any of the provisions of the  was no that the    any modifications to be
judges: Tashima, Paez, Amon